### In re AnnTAYLOR STORES SECURITIES LITIGATION.

No. 91 Civ. 7145 (CBM).

United States District Court, S.D. New York.

July 27, 1992.

OPINION ON MOTION TO DISMISS

MOTLEY, District Judge.

Plaintiffs brought this suit as a securities class action on behalf of all persons, other than defendants, who purchased the common stock of defendant AnnTaylor Stores Corporation ("AnnTaylor" or the "Company") in its May 16, 1991 Initial Public Offering ("IPO") and thereafter, through October 22, 1991 inclusive (the "Class Period"). (¶¶ 1, 31).[1] Plaintiffs are several individuals and corporate entities who were allegedly damaged by their purchases during the Class Period. (¶¶ 14–22). On April 14, 1992, plaintiffs filed a Second Consolidated and Amended Class Action Complaint (the "Complaint").

On May 4, 1992, AnnTaylor and defendants Merrill Lynch & Co., Inc. ("ML & Co."), Joseph E. Brooks and Thomas H.K. Brooks filed a motion to dismiss the Complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted and failure to plead fraud with the requisite particularity. Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("MLPF & S"), which is named solely in Count I of the complaint, filed its own motion to dismiss which adopts, in pertinent part, the arguments of the other defendants.

After briefing, the court held argument on June 12, 1992. On June 25, 1992, the court filed an Order denying defendants' motions. This Opinion sets forth the court's rationale for that Order.

## I. Background[2]

### A. The defendants.

AnnTaylor is a Delaware corporation with its executive offices in New York City. (¶ 23). Through its wholly owned subsidiary, AnnTaylor, Inc., AnnTaylor is a leading specialty retailer of better-quality women's apparel, shoes and accessories. (¶ 23). As of November 2, 1991, AnnTaylor operated 200 stores in 36 states and the District of Columbia. (¶ 23).

Joseph Brooks was the Chairman and Chief Executive Officer of AnnTaylor during the Class Period. (¶ 24). AnnTaylor announced in November 1991 that Joseph Brooks would retire. (¶¶ 26, 85). He was succeeded on January 31, 1992 by Sally Frame Kasaks. (¶ 86).

Thomas Brooks, the son of Joseph Brooks (together, the "individual defendants"), was President, Chief Operating Officer and a director of AnnTaylor during the Class Period. (¶ 27). His resignation from AnnTaylor was announced on October 15, 1991. (¶ 27).

ML & Co., through its subsidiary Merrill Lynch Capital Partners, Inc. ("ML Capital Partners") and other affiliates, owns about 59.0% of AnnTaylor's common stock. (¶ 29). Three representatives of ML Capital Partners are on AnnTaylor's board of directors. (¶ 29).

MLPF & S is an underwriting and securities brokerage firm. (¶ 30). MLPF & S was one of the two lead underwriters in the IPO and is an affiliate of ML & Co. (¶¶ 30, 56).

### B. The February 1989 buy-out.

In February 1989, a group led by Joseph Brooks, ML Capital Partners and certain other members of AnnTaylor's manage-

---

1. References to relevant paragraphs in the Complaint are cited to as "(¶ ___)."

2. For purposes of these motions to dismiss, the well-pleaded allegations of the Complaint are taken as true. *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d

404 (1969); *Frasier v. General Elec. Co.,* 930 F.2d 1004, 1007 (2d Cir.1991). However, "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114, 122 (S.D.N.Y.1988) (citation omitted).

ment, including Thomas Brooks (the "Brooks Group"), purchased AnnTaylor from Allied Stores Corporation, taking AnnTaylor private in a $430 million leveraged buy-out. (¶¶ 25, 27, 45). The Brooks Group incurred substantial indebtedness in connection with financing the buy-out. (¶ 46). As a result, AnnTaylor had significant debt-service obligations. (¶ 46).

### C. AnnTaylor's relationship with Joan & David

Prior to 1990, all shoes sold in AnnTaylor stores were sold by non-party Joan & David Helpern, Inc. ("Joan & David"), whose shoes retail for $150–$300 a pair. (¶ 44). Joan & David's relationship with AnnTaylor went back roughly twenty five years. (¶ 44). Joan & David had a License Agreement with AnnTaylor whereby AnnTaylor received a fee equal to a fixed percentage of Joan & David's net sales. Prospectus at 26.

After the buy-out, the business relationship between AnnTaylor and Joan & David soured. (¶¶ 49–50). In December 1989, AnnTaylor announced the introduction in March 1990 of its new private label line of footwear into 50 of its then–139 stores. (¶ 51). The line of shoes would retail for $85–$100 a pair and be displayed separately from Joan & David shoes. (¶ 51). Three months later, Joan & David sued AnnTaylor to enjoin the Company from interfering with its business. (¶ 52). To settle the litigation, Joan & David agreed to close its leased shoe departments in AnnTaylor stores by February 1993. (¶ 53). Despite the settlement, tension between Joan & David and AnnTaylor continued throughout the "phase-out" period. (¶¶ 53–54).

### D. AnnTaylor's May 16, 1991 IPO.

In the IPO on May 16, 1991, AnnTaylor sold a total of 7,015,000 shares at $26 per share and defendants raised approximately $167 million for AnnTaylor. (¶¶ 32(a), 56). Plaintiffs assert that the Brooks Group decided to commence the IPO in order to alleviate the heavy debt burden it incurred

in taking AnnTaylor private two years earlier (¶ 55). In addition, ML & Co.'s aggregate investment in AnnTaylor increased from an original investment of $78 million to $298 million after the IPO and the value of the Brooks Groups' investment increased from an original investment of $1.9 to $7.5 million. (¶ 56). As an underwriter, MLPF & S received substantial fees, expenses and discounts from the IPO. (¶ 30).

In connection with the IPO, AnnTaylor and ML & Co. filed a registration statement with the Securities and Exchange Commission. The registration statement included a Prospectus [3] dated May 16, 1991 and was signed by Joseph Brooks and Thomas Brooks (¶¶ 24, 27). It was declared effective on May 16, 1991 and disseminated to the public. (¶¶ 2, 56).

### E. Plaintiffs' claims.

#### 1. Count I of the Complaint: misstatements and omissions in the Prospectus.

Count I of the Complaint alleges that the Prospectus is materially false and misleading in violation of Section 11 of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. § 77k. Plaintiffs allege four violations of Section 11. (¶ 89).

First, plaintiffs claim that defendants failed to disclose that AnnTaylor had changed course, that the AnnTaylor described in the Prospectus was fundamentally different from the AnnTaylor which plaintiffs purchased during the Class Period. The Prospectus contains numerous positive statements concerning the better quality of AnnTaylor's exclusive private-label merchandise and its merchandising focus on upscale customers (¶¶ 58–60). For instance, the Prospectus states that AnnTaylor

is a leading specialty retailer of better quality women's apparel, shoes and accessories. AnnTaylor stores offer a distinctive collection of ready-to-wear sportswear, dresses and suits, consisting

---

**3.** This court may consider the Prospectus on this motion to dismiss because it is a public record filed with the SEC, and also because it is referred to and quoted extensively in the Com-

plaint. *E.g., Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991) (district court may consider offer to purchase and proxy statement on motion to dismiss).

primarily of exclusive private label fashions complemented by a selection of designer and brand name goods. The Company's merchandising strategy focuses on achieving the "AnnTaylor look", which emphasizes classic styles, updated to reflect contemporary tastes.... Sales associates are trained to assist customers in merchandise selection and wardrobe coordination, helping them to achieve the AnnTaylor look while reflecting the customers' personal styles. The Company believes that the majority of its customers are career women with limited time to shop who are attracted to Ann-Taylor by its focused merchandising strategy, personalized customer service....

Prospectus at 3.

Plaintiffs allege that AnnTaylor changed in two ways: (a) by lowering the quality of its private label merchandise, substituting synthetic fabrics and blends for natural fibers, and becoming less fashion-forward and innovative with its merchandise, and (b) by changing its merchandising focus from an affluent, fashion conscious clientele to a less affluent, less fashion-forward client base. (¶¶ 61, 89(a)). Plaintiffs assert that defendants not only failed to disclose these changes but also the risks attendant to such changes. (¶¶ 61, 89(a)). Plaintiffs point out that after Thomas Brooks and Joseph Brooks resigned from AnnTaylor in October and November 1991, respectively (¶¶ 26, 27), AnnTaylor's new chief executive, Sally Frame Kasaks, stated on February 3, 1992 that among her first priorities was "setting standards ... to get the quality of merchandise back on track." (¶ 86).

Plaintiffs' second Section 11 claim concerns the phase-out of Joan & David leased shoe departments. On this subject, the Prospectus states:

Prior to 1990, all shoes sold in AnnTaylor stores were sold by Joan & David pursuant to the terms of the License Agreement. In 1990, the Company introduced a line of AnnTaylor shoes which can be coordinated with AnnTaylor clothing and accessories. The Company believes that, by providing its own shoe designs, it is better able to serve its customers' needs.

To implement the transition from Joan & David leased shoe departments to Ann-Taylor owned shoe departments, the Company and Joan & David entered into the Amended License Agreement which provides that Joan & David leased shoe departments will be gradually phased out of AnnTaylor stores and will be discontinued completely by February 1, 1993.

\* \* \* \* \* \*

Sales through leased shoe departments totaled $42,591,000, or 12.0% of net sales, in 1989 (the last full year of Joan & David shoe sales prior to commencement of the transition to AnnTaylor shoes) and $35,517,000, or 8.6% of net sales, in 1990.... Because the Company expects to achieve higher operating margins through sales of its own shoes, the Company believes that the phasing out of its relationship with Joan & David will not have a material adverse effect on the Company's business or results of operations.

Prospectus at 26. Previously, the Prospectus disclosed that AnnTaylor's decision to phase out Joan & David leased shoe departments had had a negative effect on comparable store sales [4] in 1990:

The increase in comparable store sales in 1990 was negatively affected by adverse economic conditions, including the decline in consumer confidence due to the current economic downturn, the war in the Persian Gulf and the rise in unemployment, all of which contributed to the slowdown in consumer spending, particularly in the fourth quarter, and the phase-out of the Joan & David leased shoe departments. While total comparable store sales increased 2.3% in 1990,

---

**4.** The indicator "comparable store sales" measures the change in sales from the same period

last year in stores open in both periods.

comparable store sales excluding Joan & David leased shoe departments net sales increased 5.1%.

Prospectus at 16.

Plaintiffs claim that the statement that "the phasing out of its relationship with Joan & David will not have a material adverse effect on the Company's business" was materially misleading because (1) Joan & David shoe departments attracted a significant number of customers to the floor, (2) Joan & David's high fashion shoes, which complemented AnnTaylor's traditionally fashion-forward, high-quality private-label merchandise attracted higher-end recession proof customers to the stores, (3) AnnTaylor was taking a greater risk by designing and marketing its own brand of shoes, which were significantly different in price and quality from Joan & David shoes, and (4) the phaseout of the high fashion Joan & David shoe departments would result in the exodus of AnnTaylor's high-end, recession-proof customers, contribute to the decline in store traffic, and adversely affect comparable store sales. (¶¶ 63, 89(b)).

Plaintiffs' third Section 11 claim concerns AnnTaylor's rapid expansion program. In the Prospectus, AnnTaylor represents that it plans to expand to reach new customers in two ways: (1) by adding additional stores in major cities and their suburbs where it already has a presence and (2) by opening stores in additional cities which it believes has a sufficient concentration of its target customers. Prospectus at 24. The Prospectus indicates that AnnTaylor anticipates opening 30 or more new stores per year for the next three years. Prospectus at 24. The Prospectus goes on to state that:

The Company's ability to continue to expand will be dependent upon general economic and business conditions affecting consumer spending, the availability of desireable locations and the negotiation of acceptable lease terms for new locations. The Company does not believe that the current economic downturn will adverse-

ly affect its ability to continue its store expansion program.

Prospectus at 24.

Plaintiffs allege that these statements are materially misleading because the Prospectus failed to disclose that (1) store expansion was cannibalizing the business of existing stores by opening new stores nearby, which cut into the sales of the existing older stores and adversely impacted comparable store sales, (2) a significant number of existing and newly-opened stores are located in the Northeast states, which were and would continue to be particularly affected by the economic downturn, and (3) AnnTaylor's rapid expansion program was not conducive to the purportedly focused merchandising strategy and blue-chip image touted in the Prospectus. (¶¶ 65, 89(c)). In addition, plaintiffs claim that the Prospectus failed to disclose the risks attendant with such rapid growth. (¶¶ 65, 89(c)).

Finally, plaintiffs' fourth Section 11 claim concerns the following statement in the Prospectus:

The Company's net sales do not show significant seasonal variation, although net sales in the third and fourth quarters have traditionally been higher than in the first and second quarters. The Company believes that its merchandise is purchased primarily by women who are buying for their own wardrobes rather than as gifts, and the Company typically experiences only moderate increases in net sales during the Christmas season. As a result of these factors, the Company has not had significant overhead and other costs generally associated with large seasonal variations. Operating income margin is strongest in the third quarter due to increased sales volume combined with higher margins and lower markdowns.

Prospectus at 15. The Prospectus then sets out the net sales and operating income for the previous three years, 1988–1990. Prospectus at 15.

Plaintiffs assert that defendants had no reasonable basis to believe that the net sales and operating income margins in the third quarter of 1991 would be above sales and margins in the first two quarters of

1991 due to the phaseout of Joan & David and the fact that AnnTaylor had changed course (as described in the first Section 11 claim). (¶¶ 67, 89(d)).

### 2. Count III: after-market misrepresentations.

On or about May 21, 1991, AnnTaylor announced its financial results for the 1991 first quarter ending May 4, 1991. (¶ 68). Sales increased 11.7%, operating income increased 15.8% and comparable store sales, excluding Joan & David leased shoe departments, increased 4.1%. (¶ 68). Thereafter, the market price of the stock increased during the summer of 1991, reaching a high of $36.50 per share on July 16, 1991, and closing at $32⅜ per share on August 27, 1991. (¶ 5).

The Complaint includes no specific allegations about AnnTaylor's financial results for the second quarter of 1991. However, plaintiffs allege that AnnTaylor's comparable store sales began to decline in June 1991 and also declined in July 1991. (¶¶ 73–74).

On August 28, 1991, AnnTaylor preliminarily announced that its sales for August, the first month in the third quarter, were up 10.0%, but that comparable store sales were down 5.0%. (¶¶ 6, 74). Consequently, the stock price fell from $32⅜ per share to $29½ per share before rebounding to $31 per share. (¶¶ 6, 74). Volume was about 600,000 shares, nearly six times the average daily trading volume. (¶¶ 6, 74).

In a press release issued on August 29, 1991, AnnTaylor attributed the decline in its stock price to the August sales data. (¶ 75). AnnTaylor went on to state that it "strongly believe[d]" that the August decline was "not meaningful" and that it was "fully confident of its ability to achieve operating expectations for the third and fourth quarters." (¶¶ 6, 75–76). AnnTaylor denied that the August decline represented a trend and predicted that same store sales for the whole year would increase 3.0%. (¶¶ 6, 75). Moreover, AnnTaylor predicted that it would earn $0.40 per share for the third quarter ending October 31, 1991 and $0.35–$0.37 per share for the fourth quarter ending January 31, 1992. (¶ 6).

In Count III of the Complaint, plaintiffs allege that AnnTaylor's August 29, 1991 statements violated Section 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder. Plaintiffs claim that defendants knew, based on daily sales reports, that its comparable store sales were sliding further and would continue to decline. (¶¶ 75, 106). Thus, plaintiffs assert that defendants violated Section 10(b) and Rule 10b–5 by failing to disclose and denying that declining comparable store sales was a trend or an indication of problems with AnnTaylor's business. (¶¶ 2, 106).

On September 5, 1991, AnnTaylor announced that comparable store sales for August had declined 8.1%. (¶ 75).

On October 1, 1991, Jeffrey Edelman, an analyst at C.J. Lawrence, Morgan, Grenfell, Inc., lowered his earnings estimate for AnnTaylor's third quarter from $0.40 per share to $0.30 per share. (¶¶ 7, 79). Plaintiffs allege that on the same day an AnnTaylor spokesperson stated that AnnTaylor was "comfortable" with Mr. Edelman's estimate. (¶¶ 7, 81).

In Count III, plaintiffs also allege that AnnTaylor's October 1, 1991 statement violated Section 10(b) and Rule 10b–5. Plaintiffs again claim that defendants knew that its comparable store sales were sliding further and would continue to decline. (¶ 106). Thus, plaintiffs assert that defendants violated Section 10(b) and Rule 10b–5 by failing to disclose and denying that declining comparable store sales was a trend or an indication of problems with AnnTaylor's business. (¶¶ 2, 106).

On October 10, 1991, AnnTaylor reported that comparable store sales for September, excluding sales from Joan & David leased shoe departments, declined by 6.2% and, for the business as a whole, by 10.2%. (¶ 80).

On October 22, 1991, AnnTaylor announced that in view of continuing sluggish sales trends in October, it expected that its third quarter earnings would be in the range of $0.17 to $0.20 per share. (¶¶ 7, 82). AnnTaylor also stated that compara-

ble store sales for October were down 6.8%, excluding sales from Joan & David leased shoe departments, and down 10.0% on the whole. (¶¶ 7, 82). AnnTaylor admitted that this resulted from a "trend" of "continuing sluggish sales." (¶¶ 8, 82). AnnTaylor's stock price fell from $19⅞ per share to $16½ per share on October 22, 1991 on trading volume of 886,000 shares. (¶¶ 9, 83).

On November 8, 1991, AnnTaylor reported that comparable store sales declined 8.6% for the month of October 1991.

### 3. Counts II, IV and V: derivative and pendant state claims.

Plaintiffs raise three additional claims. Counts II and IV are derivative claims, alleging that because defendants are liable under Counts I and III for primary violations of federal securities laws, "controlling" defendants are also liable under Section 15 of the 1933 Act and/or Section 20(a) of the 1934 Act. Finally, Count V is a pendant state claim for common law fraud and deceit.

### II. Defendants' Motions to Dismiss

Defendants have moved to dismiss all five Counts in the Complaint for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the motions are denied.

### A. The standard for dismissal under Rule 12(b)(6).

■ A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if it appears beyond doubt that plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Goldman v. Belden*, 754 F.2d 1059, 1065 (2d Cir.1985); *Seagoing Uniform Corp. v. Texaco, Inc.*, 705 F.Supp. 918, 927 (S.D.N.Y. 1989). Therefore, on a motion to dismiss, all factual allegations of the complaint must be accepted as true, *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Frasier v. General Elec. Co.*, 930 F.2d 1004, 1007 (2d Cir.1991), and all reasonable inferences must be made in plaintiffs' favor. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989); *Meilke v. Constellation Bancorp*, No. 90 Civ. 3915, 1992 WL 47342, at *2, 1992 U.S.Dist. LEXIS 2368, at *2 (S.D.N.Y. March 4, 1992). "The court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d at 1067 (citation omitted).

### B. The Complaint adequately sets forth four claims under Section 11 of the 1933 Act

■ In Count I of the Complaint, plaintiffs claim that all defendants, other than ML & Co. (Complaint at 33), violated Section 11 of the 1933 Act by their involvement in the issuance of the allegedly materially false and misleading Prospectus. Plaintiffs claim four violations of Section 11.

Section 11 provides that every signer and underwriter may be held liable for a registration statement which "includes untrue statements of material facts or fails to state material facts necessary to make the statements therein not misleading." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208, 96 S.Ct. 1375, 1388, 47 L.Ed.2d 668 (1976). *See* 15 U.S.C. § 77k(a)(1), (5); *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991); *see also, Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983) (plaintiff who "purchased a security issued pursuant to a registration statement ... need only show a material misstatement or omission to establish his prima facie case").

■ Scienter is not an element in a section 11 claim. *Herman & MacLean v. Huddleston*, 459 U.S. at 382, 103 S.Ct. at 687. Thus, "even innocent misstatements" in a registration statement will subject an issuer to liability under section 11. *Id.; Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 973 (E.D.N.Y.1988), *vacated*

*in part on other grounds,* 714 F.Supp. 1285 (E.D.N.Y.1989). An issuer has absolute liability for any misrepresentations or omissions; the underwriters and signatories have an affirmative due diligence defense. *See Herman & MacLean v. Huddleston,* 459 U.S. at 382, 103 S.Ct. at 687.

Plaintiffs' allege that AnnTaylor's registration statement (which included the Prospectus) contained the following material misstatements and omitted the following facts:

> (a) it failed to disclose that AnnTaylor had changed course by (1) lowering the quality of its private label merchandise and (2) changing its merchandising focus to a less affluent, less fashion-forward clientele, and failed to disclose the risks attendant to such a change (¶¶ 58–61, 89(a));
>
> (b) there was no reasonable basis for stating that phase-out of Joan & David would not have a material adverse effect on AnnTaylor's business (¶¶ 62–63, 89(b));
>
> (c) there was no reasonable basis for stating that the current economic downturn would not adversely affect AnnTaylor's ability to continue its rapid expansion program (¶¶ 64–65, 89(c)); and
>
> (d) the statement that operating income is strongest in the third quarter was misleading (¶¶ 66–67, 89(d)).

These claims, if proven, are sufficient to find liability against defendants under Section 11.

In the first claim, plaintiffs assert that the AnnTaylor which was described in the Prospectus was not the same company which plaintiffs purchased in the IPO and thereafter. Plaintiffs claim that non-disclosure of the change deprived them of their right to make an informed purchase, which Section 11 is designed to protect. Thus, plaintiffs' claim is not mismanagement, as defendants contend, but non-disclosure of the change and the attendant risks. *See Mermelstein v. The Bank of New York,* No. 90 Civ. 3400, slip op. at 5 (E.D.N.Y. June 14, 1991) ("it is not mismanagement but defendant's failure to disclose the true economic condition of the bank that plaintiffs allege constitutes a violation of the securities laws").

However, the court feels compelled to note that even plaintiffs' claim of non-disclosure is tenuous. Defendants point out that the focus of the federal disclosure requirements is publication of "material objective factual matters." *Data Probe Acquisition Corp. v. Datatab, Inc.,* 722 F.2d 1, 6 (2d Cir.1983), *cert. denied,* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984). It is questionable whether this first claim alleges such non-disclosure. For instance, plaintiffs claim that when AnnTaylor changed course, it failed to disclose that it was forsaking its "higher-end, recession proof customers" and "fashion-forward and innovative merchandise." (¶ 61, 89(a)). The court is not convinced that these seemingly subjective concepts are "material objective factual matters" that need be disclosed pursuant to Section 11.

Plaintiffs argue that it was defendants who put these terms "in play" when defendants affirmatively characterized its merchandise and customer base in the Prospectus. Plaintiffs contend that when using descriptions such as "better quality" and "exclusive," defendants had the duty to speak truthfully and could not mislead potential purchasers, citing *Shapiro v. UJB Financing Corp.,* 964 F.2d 272 [1991–1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,651, at ¶ 93,067–68 (3d Cir.1992). In that case, the court found that a bank which characterized its loan loss reserves as "adequate" or "solid," even though it knew the reserves were inadequate or unstable, exposed itself to potential liability for securities fraud. Besides the fact that Count I is not a fraud claim (according to plaintiffs), the characterizations in *Shapiro*—relating to a bank's financial condition—are more concrete than those alleged to be misleading here. Although the court does not dismiss this claim at this time, the burden remains on plaintiffs to prove that defendants failed to disclose material objective factual matters in order to prevail on the merits.

The court also sees little merit to plaintiffs' second claim under count I where plaintiffs allege that defendants had no reasonable basis for making the statement that it believed that the phaseout of Joan &

David would "not have a material adverse affect" on AnnTaylor's business. Prospectus at 26. The problem is that plaintiffs do not specify solid support for its claim. Plaintiffs assert that: (1) Joan & David shoe departments attracted a significant number of customers to the floor, (2) Joan & David's high fashion shoes, which complemented AnnTaylor's traditionally fashion-forward, high-quality private-label merchandise attracted higher-end recession proof customers to the stores, (3) AnnTaylor was taking a greater risk by designing and marketing its own brand of shoes, which were significantly different in price and quality from Joan & David shoes, and (4) the phaseout of the high fashion Joan & David shoe departments would result in the exodus of AnnTaylor's high-end, recession-proof customers, contribute to the decline in store traffic, and adversely affect comparable store sales. (¶¶ 63, 89(b)). Besides the fact that these reasons are repetitive and obvious, the court questions whether any of them could tend to prove that defendants had no reasonable basis for making the statement regarding the phaseout of Joan & David. The court finds that this claim is sufficiently pled under Section 11, although the court is not confident about plaintiffs' ability to prove the case on the merits.

Plaintiffs' third claim under Section 11, concerning AnnTaylor's rapid expansion, is also weak. In the Prospectus, defendants described the expansion plan in detail and stated that it "[did] not believe that the current economic downturn [would] adversely affect its ability to continue its store expansion program." Prospectus at 24. In their brief, plaintiffs reframed their theory to allege that defendants had no reasonable basis for making this statement. The problem again lies in plaintiffs' attempt to substantiate its claim. Plaintiffs allege that: (1) store expansion was cannibalizing the business of existing stores by opening new stores nearby, which cut into the sales of the existing

older stores and adversely impacted comparable store sales, (2) a significant number of existing and newly-opened stores are located in the Northeast states, which were and would continue to be particularly affected by the economic downturn, and (3) AnnTaylor's rapid expansion program was not conducive to the purportedly focused merchandising strategy and blue-chip image touted in the Prospectus. In addition, plaintiffs claim that the Prospectus failed to disclose the risks attendant with such rapid growth. (¶¶ 65, 89(c)).

Again, it is debatable whether any of these reasons could tend to prove that defendants lacked a reasonable basis for its statement. It is also questionable whether the failure to disclose the risks attendant to such rapid growth could amount to a material omission.[5] The court allows plaintiffs to proceed with this claim, but again is not confident about plaintiffs' ability to prove the case on the merits.

Defendants fourth claim under Count I concerns the statement in the Prospectus that "[o]perating income margin is strongest in the third quarter due to increased sales volume combined with higher margins and lower markdowns." Prospectus at 15. Plaintiffs assert that defendants had no reasonable basis to believe that the net sales and operating income margins in the third quarter of 1991 would be above sales and margins in the first two quarters of 1991 due to the phaseout of Joan & David and the fact that AnnTaylor had changed course. (¶¶ 67, 89(d)).

Based on the context of the statement, it certainly seems that defendants were making a historical point about third quarter earnings and not a prediction about the upcoming year. *Cf. Friedman v. Mohasco Corp.,* 929 F.2d 77, 79 (2d Cir.1991); *Hershfang v. Citicorp,* 767 F.Supp. 1251, 1256 (S.D.N.Y.1991). However, given the timing of the IPO, with the third quarter looming in the short term, plaintiffs may be able to

---

**5.** A fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96

S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). This standard is the same under Section 11 of the 1933 Act. *Kronfeld v. Trans World Airlines, Inc.,* 832 F.2d 726, 731 (2d Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988).

offer proof that they were misled by the Prospectus. Therefore, the court does not dismiss this claim at this time.

### C. The complaint adequately sets forth claims under Section 10(b) and Rule 10b–5 of the 1934 Act

■ In Count III of the Complaint, plaintiffs claim that AnnTaylor and the individual defendants violated Section 10(b) of the 1934 Act and Rule 10b–5 promulgated thereunder by their involvement in two sets of allegedly false and misleading statements which AnnTaylor made to the public. On August 29, 1991, the day after AnnTaylor reported that comparable store sales had declined 5.0% in August, AnnTaylor stated, among other things, that it "strongly believe[d]" that the August decline was "not meaningful" or indicative of problems in AnnTaylor's business. Then on October 1, 1991, a Company spokesperson allegedly stated that AnnTaylor was "comfortable" with an analyst's projection that AnnTaylor would earn $0.30 per share in the third quarter. The Complaint alleges that AnnTaylor made these statements in order to stem the tide of declining stock prices. (¶¶ 6, 75). Plaintiffs claim that the statements were materially false and misleading because defendants knew, based on periodic sales reports, that AnnTaylor's slide would continue, that the declines were part of a trend and indicative of underlying problems within AnnTaylor's business. (¶¶ 73–76, 79, 81, 106).

■ In order to state a claim under Section 10(b) and Rule 10b–5, plaintiffs must allege: (1) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security, (2) an intent to defraud, (3) justifiable reliance on the misrepresentation or omission, (4) causation and (5) damages. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 241–43, 108 S.Ct. 978, 988–89, 99 L.Ed.2d 194 (1988); *HB Holdings Corp. v. Scovill*, [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,201, at 95,820, 1990 WL 37869 (S.D.N.Y.1990).

Defendants do not dispute that plaintiffs have adequately pled the elements of reliance, causation and damages. Rather, defendants argue that their statements are not actionable under Section 10(b) and Rule

10b–5 because they were not misrepresentations or omissions of material fact but simply expressions of opinions, beliefs and predictions. For support, defendants cite *Hershfang v. Citicorp*, 767 F.Supp. at 1252, 1256, where the court dismissed allegations based on news articles which, among other things, described statements by Citicorp officers about Citicorp's dividend and staff retention plans. These were contrasted with a later announcement by Citicorp that it had decided to reduce its annual dividend and the number of its employees. Plaintiff alleged a scheme devised by Citicorp and certain of its officers to inflate the price of Citicorp stock, in violation of Section 10(b) and Rule 10b–5. The court dismissed under Rule 9(b) because plaintiffs did not allege any facts to suggest that defendants did not actually hold the views they expressed or any facts that could lead to such an inference.

Thus, *Hershfang* is not contrary to plaintiffs' assertion that opinions, predictions, forecasts or beliefs *made with an intent to deceive or without any reasonable basis* are actionable under Section 10(b). *See, e.g., Virginia Bankshares, Inc. v. Sandberg*, — U.S. —, —, —; 111 S.Ct. 2749, 2757, 2758, 115 L.Ed.2d 929, 944, 946 (1991) ("a statement of belief by corporate directors about a recommended course of action, or an explanation of their reasons for recommending it" could be materially misleading if the corporate directors did not hold the beliefs or opinions expressed; expressions of such beliefs or "judgments can be uttered with knowledge of truth or falsity just like more definite statements"); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 n. 13 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) ("an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth [is] ... sufficient upon which to base liability" [citation omitted] ); *Lazzaro v. Manber*, 701 F.Supp. 353, 363–64 (E.D.N.Y.1988) (same); *In re Chaus Sec. Litig.*, [1990–91 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,646, at 98,001, 1990 WL 188921 (S.D.N.Y.1990) (a forecast can violate Section 10(b) if it is "a representation of a company's 'informed and reasonable belief'

in its future performance that 'it did not then believe' or 'knew that there was reason [not] to believe,' or is made without a 'reasonable method of preparation and a valid basis.' " [citation omitted] ); *Marbury Management, Inc. v. Kohn*, 470 F.Supp. 509, 512 (S.D.N.Y.1979), *aff'd in part, rev'd in part on other grounds*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980) ("A false prediction, however, may be actionable if the plaintiff establishes that the statements ... were not prepared in a reasonable manner or with a firm basis"); *Beecher v. Able*, 374 F.Supp. 341, 348 (S.D.N.Y.1974) ("an earnings forecast must be based on facts from which a reasonably prudent investor would conclude that it was highly probable that the forecast would be realized.").

The issue here is whether plaintiffs have alleged facts sufficient to suggest that AnnTaylor or the individual defendants did not actually hold the views expressed in the allegedly fraudulent after-market statements. Plaintiffs have done so. First, plaintiffs assert that AnnTaylor and the individual defendants had a motive for making fraudulent statements. AnnTaylor and the individual defendants had gone heavily into debt in taking AnnTaylor private two years earlier (¶ 55) and, with the IPO, the individual defendants had greatly increased their investment in AnnTaylor. (¶ 56). By making the allegedly fraudulent after-market statements, plaintiffs claim that the individual defendants, and AnnTaylor *a fortiori*, could continue and prolong the illusion of AnnTaylor's successful growth and management and inflate the price of AnnTaylor's securities. This would enable the individual defendants to (1) protect and enhance their executive positions and the substantial compensation, emoluments, perquisites and prestige they obtained thereby, and (2) enhance the value of their personal holdings of AnnTaylor common stock and options. (¶ 28). Given that they each resigned fairly soon after the allegedly fraudulent October 1, 1991 statement, such motives can be inferred at this time.

Second, plaintiffs assert a factual basis for its claim of fraud, alleging that Ann-Taylor made the allegedly fraudulent after-market statements in order to stem the tide of declining stock prices even though defendants knew, based on daily sales reports, that its comparable store sales were sliding further and would continue to decline. (¶¶ 75, 106). To support this claim, plaintiffs point out that the August 29, 1991 press release, which, among other things, predicted that AnnTaylor would earn $0.40 per share for the third quarter (¶ 6), was soon followed by the September 5, 1991, announcement that comparable store sales for August had declined 8.1%. (¶ 75). Additionally, plaintiffs indicate that shortly after its October 1, 1991 statement—where an AnnTaylor spokesperson allegedly stated that AnnTaylor was "comfortable" with an analysts' projection that AnnTaylor would earn $0.30 per share in the third quarter (¶¶ 7, 81)—AnnTaylor reported (1) on October 10, 1991 that comparable store sales for September, excluding sales from Joan & David leased shoe departments, declined by 6.2% and, for the business as a whole, by 10.2% (¶ 80) and (2) on October 22, 1991 that it expected that its third quarter earnings would be in the range of $0.17 to $0.20 per share and that comparable store sales for October were down 6.8%, excluding sales from Joan & David leased shoe departments, and down 10.0% on the whole. (¶¶ 7, 82). Plaintiffs suggest that defendants' follow-up statements came so closely after the initial statements that defendants must have known that the initial statements were false and/or lacked any reasonable basis. Although the court wonders how plaintiffs can accuse defendants of improperly inflating AnnTaylor's stock market price when it concedes that AnnTaylor promptly followed the allegedly fraudulent after-market statements with complete and accurate financial disclosures, at this time the court finds that plaintiffs claim is adequately pled under Section 10(b) and Rule 10b–5.

D. Counts II and IV adequately state claims for controlling person liability.

■ Count II of the Complaint alleges that the individual defendants and ML &

Co. violated Section 15 of the 1933 Act, which provides that persons who control a person liable under Section 11 of the 1933 Act are jointly and severally liable with the controlled person. 15 U.S.C. § 77o; *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. at 979. Count IV claims that the individual defendants violated Section 20(a) of the 1934 Act, which provides that any person who controls a person liable under any section of the 1934 Act is jointly and severally liable with the controlled person. 15 U.S.C. § 78t(a); *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. at 979.

Control person liability under Sections 15 and 20(a) is established when a plaintiff proves a primary violation of the securities laws and "control status"—i.e., that the controlling person had direct or indirect power to control the primary violator. *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 735 F.Supp. 587, 588 (S.D.N.Y.1990); *see Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980). Defendants' only challenge to plaintiffs' Section 15 and Section 20(a) claims is that plaintiffs have not adequately stated primary violations of the securities laws and that, accordingly, the Section 15 and 20(a) derivative claims are inadequate. Since the court has found that plaintiffs have adequately pled their claims under Sections 11 and 10(b) and Rule 10b–5, defendants' motion to dismiss Counts II and IV is denied.

**E. Count V is sufficiently pled and properly before this court.**

Count V of the Complaint alleges that AnnTaylor and the individual defendants are liable for common law fraud and deceit. "In order to establish a common law fraud claim, plaintiffs must establish essentially the same elements as in a securities fraud case." *Kuczynski v. Ragen Corp.*, [1989 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 94,378, at 92,473, 1989 WL 34055 (S.D.N.Y.1989). *See Mallis v. Banker's Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980), *cert. denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). Because the court has found that plaintiffs have sufficiently pled all of the elements of their

federal securities law claims under Section 10(b) and Rule 10b–5, plaintiffs' pendant state law claim of fraud and deceit is properly before this court. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725–27, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966); *Kuczynski v. Ragen Corp.*, [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,378, at 92,473 ("Since plaintiffs have met their burden to survive a summary judgment motion as to their federal securities law fraud claim, their common law fraud claim must also stand"); *HB Holdings Corp. v. Scovill*, [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,201, at 95,822, 1990 WL 37869 (S.D.N.Y.1990) (defendants' motion to dismiss plaintiffs' common law fraud claim was denied where plaintiffs sufficiently pled Section 10(b) claim); *Bozsi Ltd. Partnership v. Lynott*, 676 F.Supp. 505, 516 (S.D.N.Y.1987). Therefore, defendants' motion to dismiss plaintiffs' pendant state claim of common law fraud and deceit in Count V is denied.

### III. Defendants' Rule 9(b) motions

Defendants have moved to dismiss all five Counts in the Complaint for failure to plead fraud with the requisite particularity, pursuant to Rule 9(b) of the Federal Rules of Civil Procedure. For the following reasons, the motions are denied.

**A. The standard for dismissal under Rule 9(b).**

Rule 9(b) states:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally.

This pleading requirement is designed to: (1) provide defendants with fair notice of plaintiffs' claim, to enable preparation of a defense, (2) protect defendants from harm to their reputation or goodwill, and (3) reduce the number of strike suits. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). "Strike suits in this area ... permit plaintiffs with groundless claims to abuse liberal federal

discovery provisions, with the right to do so representing 'in terrorem' increments in the settlement values of the alleged claims." *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740–41, 95 S.Ct. 1917, 1927–28, 44 L.Ed.2d 539 (1975)).

To satisfy Rule 9(b), a "complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respects in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Shochat v. Weisz*, 757 F.Supp. 189, 192 (E.D.N.Y.1991) (quoting *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir. 1989)). At the same time, Rule 9(b)'s requirement of particularity must be harmonized with the flexibility in pleading permitted under Rule 8 of the Federal Rules of Civil Procedure, which requires a "short and plain statement" with each pleading being "simple, concise and direct." Fed. R.Civ.P. 8; *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir.1990).

> **B. The complaint satisfies the requirements of Rule 9(b) with respect to plaintiffs's Section 11 claims.**

■ Because proof of fraud is not necessary to prevail on a Section 11 claim, *Herman & MacLean v. Huddleston*, 459 U.S. at 382, 103 S.Ct. at 687, courts have long held that Rule 9(b) does not apply to a Section 11 claim. *See, e.g., In re Jiffy Lube Sec. Litig.*, 772 F.Supp. 258, 260 (D.Md.1991); *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. at 973; *In re Lilco Sec. Litig.*, 625 F.Supp. 1500, 1502 (E.D.N.Y. 1986); *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 594 (E.D.Mich.1985); *Ross v. Warner*, 480 F.Supp. 268, 273 (S.D.N.Y.1979); *Schoenfeld v. Giant Stores Corp.*, 62 F.R.D. 348, 350–51 (S.D.N.Y.1974). The same holds true when plaintiffs have raised a separate claim for fraud under Section 10(b). *See, e.g., In re Jiffy Lube Sec. Litig.*, 772 F.Supp. at 260; *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. at 973, 976; *In re Lilco Sec. Litig.*, 625 F.Supp. at 1502–03.

In their Opening Memorandum, defendants argue that Count I sounds in fraud and must therefore be pled with sufficient particularity under Rule 9(b). In their Reply Memorandum, defendants argue that Count I claims failure to disclose mismanagement, which is not cognizable under Section 11. Defendants are incorrect in both cases.

In their Memorandum, plaintiffs have narrowed their claims, backtracking from some of the pejorative characterizations in the Complaint. For instance, the Complaint would have had defendants "disclose" that "the caliber of AnnTaylor stores had changed from a retailing gem to an average store." (¶ 89(a)). Plaintiffs now allege that (1) defendants did not disclose the fact that AnnTaylor had changed course or the risks attendant to a change, (2) defendants had no reasonable basis for stating that the phaseout of Joan & David would not have a material adverse effect on AnnTaylor's business, (3) defendants had no reasonable basis for stating that the current economic downturn would not adversely affect AnnTaylor's ability to continue its rapid expansion program, and (4) defendants' statement that operating income is strongest in the third quarter was misleading. Since plaintiffs disavow any claim of fraud or mismanagement in Count I, it need not comply with Rule 9(b). Furthermore, because Count I is the only Count alleged against defendant MLPF & S, plaintiffs do not have to satisfy the requirements of Rule 9(b) as to this defendant.

> **C. The complaint satisfies the requirements of Rule 9(b) with respect to plaintiffs's claims under Section 10(b) and Rule 10b–5.**

Count III of the Complaint is brought against AnnTaylor and the individual defendants for two sets of allegedly false and misleading statements made by AnnTaylor. (¶¶ 102–111). The Complaint alleges when these statements were made (¶¶ 75–76, 81), the content of the statements (¶¶ 75–76, 81), the manner in which they misled the public (¶¶ 75–76, 81), and what defendants obtained as a consequence of their fraud

(¶¶ 107–109). Consequently, the Complaint satisfies the basic "what, when, where, how and why" requirements of Rule 9(b) and supplies as much detail of the alleged fraud as can be expected before discovery commences. *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. at 976. *See Goldman v. Belden*, 754 F.2d at 1065–66.

1. *Count III has been sufficiently pled for Rule 9(b) purposes even though the maker of the allegedly fraudulent statements was not specifically identified.*

■■■■ Defendants assert that Count III fails under Rule 9(b) because the allegedly fraudulent after-market statements were made by an unidentified AnnTaylor spokesperson. Initially, it must be noted that defendants are in a better position than plaintiffs to know who made the statements. Indeed, the August 29, 1991 statement was a press release issued by AnnTaylor. (¶¶ 75–76). Prior to discovery, plaintiffs are not expected to pinpoint precisely who uttered the statements. *See Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. at 976 ("The allegations supply as much detail of the alleged fraud as can be expected before discovery").

Furthermore, identification of statements made by, or on behalf of, a corporate defendant through press releases and the like, such as the allegedly fraudulent after-market statements at issue here, satisfy Rule 9(b). *See, e.g., Cosmas v. Hassett*, 886 F.2d at 12 (amended complaint adequately identified defendants as responsible for allegedly fraudulent statements made in, among other things, press releases); *Goldman v. Belden*, 754 F.2d at 1062–33, 1069–70 (the complaint "detailed the time and place at which the statements were made; and it identified the defendants charged with having made those statements [in press releases and other filings], either directly or as controlling persons or aiders and abettors.... No more is required by Rule 9(b)."); *HB Holdings Corp. v. Scovill*, [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,201, at 95,818–19 (alleging "time, place and circumstances" of misstatements issued by corporate defendants is sufficient to satisfy Rule

9(b)); *Bozsi Ltd. Partnership v. Lynott*, 676 F.Supp. at 515 (same). Indeed, to require more would defeat the purpose of the securities laws since any corporation could avoid liability under the 1934 Act, through the abuse of Rule 9(b), by simply issuing false and misleading statements through an anonymous spokesperson instead of a named officer or director. *Accord Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir.1989) ("Courts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" [citation omitted]).

2. *The Complaint sufficiently alleges fraud with the particularity required by Rule 9(b) against the individual defendants with respect to the allegedly fraudulent after-market statements.*

■■■■ When alleging fraud against multiple defendants, "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Martin v. EVP Second Corp.*, [1991 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,115, at ¶ 90,-645, 1991 WL 131176 (S.D.N.Y. July 8, 1991) (quoting *DiVittorio*, 822 F.2d at 1247). The Complaint, among other things, alleges that the individual defendants "had actual knowledge of the materially false and misleading statements and the material omissions" in the allegedly fraudulent after-market statements and "failed or refused to ascertain and disclose the true facts" so these statements would not be misleading. (¶ 108). Moreover, the Complaint states that the individual defendants "... were in a position to control or influence the contents of, or otherwise cause corrective disclosures to have been made, in AnnTaylor's ... public statements disseminated during the Class Period as detailed herein, which constituted group published information." (¶ 100(b)). Additionally, it is alleged that:

[i]n their capacity as officers and directors of a publicly-held company, these defendants had a duty to disseminate only truthful and accurate information to

the public and to the investment community and to promptly correct any materially false and misleading statements disseminated by AnnTaylor so that the price of its securities would be based on accurate and complete information.

(¶ 100(c)).

Because plaintiffs claim that the allegedly fraudulent after-market statements were uttered by AnnTaylor (¶¶ 75–76) or by a Company spokesperson (¶ 81), the individual defendants argue that plaintiffs have not demonstrated any connection between themselves and these statements. This argument ignores the allegations in the Complaint that:

—the allegedly fraudulent after-market statements were "group published information" (¶ 100(b));

—the individual defendants had "actual knowledge" that the statements were false (¶ 108);

—the individual defendants were in a position to control the statements or at least direct that corrective disclosures be made (¶ 100(b)); and

—the individual defendants allowed such misleading statements to be published and failed to correct them despite their "duty to disseminate only truthful and accurate information to the public" (¶ 100(b)).

Thus, the Complaint does allege a connection between the individual defendants and the allegedly fraudulent after-market statements.

Regardless, these defendants, each of whom is alleged to have been aware of the dissemination and content of the allegedly fraudulent after-market statements through press releases and the media, need not be directly responsible for making each of the misstatements during the Class Period in order to satisfy the requirements of Rule 9(b). "[P]ress releases and other statements to investors and purchasers of the companies' securities" are documents which "may be presumed to entail the collective actions of the directors [and] officers." *Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902, 911 (S.D.N.Y.1983); *see Quantum Overseas, N.V. v. Touche Ross & Co.*, 663 F.Supp. 658, 667–68

(S.D.N.Y.1987); *accord, Feldman v. Glaze*, [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,450, at ¶ 92,892, 1989 WL 81076 (N.D.Cal.1989); *Zatkin v. Primuth*, 551 F.Supp. 39, 42 (S.D.Cal.1982) ("Where alleged actions involve the issuance of annual reports or releases, it may be presumed that these are the collective actions of the directors and officers."). As another district court explained:

[A] plaintiff may not be able to plead the precise role of each defendant when a group of defendants has acted in concert to cause the complained of injury. Under those circumstances, it is appropriate to plead the actions of the group and leave development of individual liability questions until some discovery has been undertaken, rather than to dismiss the plaintiff because he does not have what may be concealed information.

*Jackson v. First Federal Sav., F.A.*, 709 F.Supp. 863, 878 (E.D.Ark.1988). *See also Wool v. Tandem Computers, Inc.* 818 F.2d 1433, 1442 (9th Cir.1987) ("in cases of corporate fraud where the false or misleading information is conveyed in ... press releases, or other 'group published information,' it is reasonable to presume that these are the collective actions of the corporate officers."); *Seagoing Uniform Corp. v. Texaco, Inc.*, 705 F.Supp. at 934 ("defendants are 'all insiders ... and numerous courts have held that the conduct of such individuals need not be specified if the complaint sufficiently describes the fraudulent acts and provides the individuals with sufficient information to answer'" [citation omitted].). Thus, plaintiffs have alleged sufficient facts demonstrating the participation or knowing acquiescence of the individual defendants in the dissemination of the allegedly fraudulent after-market statements to satisfy Rule 9(b).

*3. The allegations in the Complaint satisfy Rule 9(b)'s requirements for pleading scienter.*

██ Defendants' argument that the Complaint does not plead scienter with particularity is meritless. Rule 9(b) specifically permits scienter to be alleged generally. Thus, this court has recognized that "[a]s a

matter of law, defendants' knowledge and intent to defraud need *not* be alleged with the same particularity as other elements of fraud under rule 9(b)." *Nicholas v. Poughkeepsie Savings Bank/FSB,* [1990–91 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,606, at 97,841, 1990 WL 145154 (S.D.N.Y.1990) (citing *Cosmas v. Hassett,* 886 F.2d at 12–13). *See Goldman v. Belden,* 754 F.2d at 1070. However, the Second Circuit does require "plaintiffs 'to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent.' " *O'Brien v. National Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991).

The Second Circuit has indicated that there are essentially two ways to establish a strong inference of scienter. Plaintiffs may allege facts showing a motive for committing fraud and a clear opportunity for doing so, or may plead scienter by identifying circumstances indicating conscious behavior by defendants. *Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 50 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988), *RICO claim overturned, United States v. Indelicato,* 865 F.2d 1370 (2d Cir.) (en banc), *cert. denied,* 493 U.S. 811, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989).

In this case, plaintiffs claim that the individual defendants, and *a fortiori* AnnTaylor, had a motive for committing fraud and a clear opportunity for doing so. The Complaint alleges the motive of the individual defendants to perpetuate a fraud on plaintiffs and the class:

> During the Class Period, defendants Joseph Brooks and Thomas Brooks (the "individual defendants") participated in the wrongdoing complained of herein in order to continue and prolong the illusion of AnnTaylor's successful growth and management and to inflate the price of AnnTaylor's securities, so that they could (1) protect and enhance their executive positions and the substantial compensation, emoluments, perquisites and prestige they obtained thereby, and (2) enhance the value of their personal holdings of AnnTaylor common stock and options.

(¶ 28).

Plaintiffs also claim that as control persons and the most senior executives of AnnTaylor, the individual defendants had a clear opportunity to commit fraud (¶¶ 24–28). Thus, under the "motive and circumstances" analysis, plaintiffs have alleged specific facts giving rise to a sufficient inference of scienter. *See Cosmas v. Hassett,* 886 F.2d at 13 (allegations that failure to qualify bullish statements was intended to permit individual defendants to profit from an inflated market price before the truth became known were sufficient to satisfy scienter element of Rule 9(b)); *Meilke v. Constellation Bancorp,* No. 90 Civ. 3915, 1992 WL 47342, at *2, 1992 U.S.Dist. LEXIS 2368, at *2–3. ("the alleged positions of defendants . . . in combination with other allegations of the Complaint, as a matter of pleading, give rise to a sufficient inference of wrongful intent or reckless disregard for the truth."); *Spear, Leeds & Kellogg v. Pub. Serv. Co.,* 700 F.Supp. 791, 793 (S.D.N.Y.1988) (allegations of financial self-aggrandizement, or for that of an employer, is sufficient to create an inference of scienter).

As discussed, *supra,* the Complaint also alleges facts which establish a strong inference of fraud specifically in connection with the allegedly fraudulent after-market statements at issue in Count III. For instance, plaintiffs claim that the August 29, 1991 press release—in which AnnTaylor stated, among other things, that it "strongly believe[d]" that the August decline in comparable store sales "was not meaningful" and that same store sales for the whole year would increase by 3.0%—was, at least, recklessly made because AnnTaylor knew at that time, based on periodic sales reports, that comparable store sales were sliding and would continue to decline. (¶ 75). Moreover, plaintiffs suggest that the close proximity between the allegedly fraudulent after-market statements (such as the October 1, 1991 statement that AnnTaylor would earn $0.30 per share for the third quarter) and follow-up statements (such as the October 22, 1991 statement

that AnnTaylor would earn $0.17 to $0.20 per share) creates an inference that defendants knew their initial statements were misleading. These inferences satisfy Rule 9(b).

*IV. Conclusion*

For all of the foregoing reasons, defendants motions to dismiss the Complaint are denied in their entirety.